Okay, the court is back in session. We'll proceed to our sixth case. Good morning, everyone. The sixth case is number 2023-96, FKFGFJ, INC. v. Village of Worth. Mr. Schiller, good morning. We'll begin with you. Good morning, your honors. May it please the court. My name is Brendan Schiller. I represent the plaintiffs in this case, FKFJ, INC. at all. I'm going to assume a little familiarity with the facts since this is an esteemed and hard-working panel, and there's been multiple filings with facts in front of it. I will say this, just in terms of a general discussion of the facts, the district court really followed defense counsel's lead in focusing on certain what I'll call micro-violations and finding justifications for each one of those violations. But when you take a step back and look at the larger mosaic of the narrative here, what you have is a brief four- or five-month period prior to a political campaign where the village apparatus was very good at helping FKFJ and its owners get things done, kind of in an old-school political way. And then you have a four-month political campaign where they made the mistake of supporting the mayor's opponent. And then you have an eight-month period where you have an old-school way of the village finding ways to be very unhelpful, including things like suggesting that they use a different architect, suggesting that they use a different photographer for their presentation to the board for the special use, encouraging them to pay their bills quicker, and then ticketing them for all sorts of violations even though they weren't their cars, they weren't the ones who owned the lot, and they were trying to repair a lot that the mayor herself suggested that they do just a year earlier when they were on good terms. So with each one of these kind of particular violations that the court addressed, there may seem to be on the surface justifications. But when you take a step back and look at the larger picture, there's a clear dispute of fact here as to whether or not you had an entire village apparatus giving a hard time, for lack of a better term, abusing its power in retaliation for a political decision that the owners made to support a political opponent. And that's the basic story here. And there's enough facts in the record to allow a reasonable jury to find that and to find clear violations of the First and Fourteenth Amendment. When we talk about... Mr. Schiller, can I, if you don't mind, can I offer a reaction in response to your opening there? And you can tell me where I go awry here. What I have a harder time or what I have the hardest time with here is on the causation element with respect to the village president or village mayor, Mary Werner. And let me tell you specifically why. The record you write suggests or shows, perhaps, that she had awareness of the parking tickets that were issued. In other words, it's not a situation where you face a hurdle of trying to establish knowledge on her part. I think she knew about it. I think you've done okay there. But I don't know that she was the impetus for the parking tickets. And when it comes to the permitting issue, the special permitting for that lot, she actually seems to have helped your clients, in the end, get the special permit in, what, late 17 or early 18. And along the way, she seems to have helped them fill out an early draft of it or fill out some portions of it. Those couple of facts seem very much at odds with your narrative that she was intent on making life miserable as a political payback. So where do I go wrong there? I have three responses to that. The first response is, specifically as it relates to the parking tickets, I think there's enough evidence in the record, enough inferences, that there were communications between her and Ms. Misetech based on how the two individual clients that were the owners of FKFJ viewed their interactions with her. Which brings me to the second point. I think the way you describe her being helpful is what the district court said and is looking at the facts, really in a light most favorable to her, is accepting her testimony. When we have testimony from both owners, as well as their attorney, that that was kind of fake helpless. That wasn't real helpless. That she was pretending to help in order to delay. But this brings me to the third point. The most clearest fact, as it relates to what she did that caused issue, was she was the one who said in December of 2017, we can't give you a business license because somebody else already has a business license there, a tobacco license, when two months earlier, she had secretly given that somebody else a tobacco license, even though my clients already had a tobacco license there. It said completely unironically and without any understanding of the obvious contradiction there and how she had done a favor to another business person for the sole purpose so that she could hurt our folks two months later, without even publicizing that they had that license. This is what I mean by kind of old school abuse of power. The parking ticket, here's, maybe she wasn't personally aware of the parking tickets. I find it hard to believe. This is a small village, 10,000 folks, a small, a kind of small political apparatus. She was. You've persuaded, I mean, you've at least persuaded me. I think she knew about the parking tickets. Now, knowing about them and being responsible for them are a different thing. The question is, is there, is there a reasonable, could a jury reasonably infer that because she's doing these other things, particularly that last combination of things at the very end of this, where she deprives them their license for reason, for, you know, clearly using kind of old school politics, is that, can you infer from that, that maybe she was the cause, that maybe she did essentially conspire with Misotech, that she really did have animus, and because of that, everything that seemed to kind of go wrong during that year was in part because of her. At least, if we're talking about causation, I think it's at least a factual question for the jury to decide. I had asked for five minutes of rebuttal because I didn't share what you all were going to ask questions. So, if there's no other questions, I'd like to reserve my last three minutes. Yeah, very well. Thank you. Okay, Mr. Ryan, we'll turn to you. Good morning. Good morning, your honors. May it please the court. If we could just work a little bit backwards from what Mr. Schiller argued with regard to the business license renewal, which his clients were seeking at the end of the year of 2017. In November of that year, the owner of the building in which the plaintiffs had the restaurant came to Ms. Werner, the mayor, complaining to her that he was going to have to find a new tenant for the restaurant premises because the restaurant owners were not paying him his rent and the record shows that he claims they owed him $250,000. He was unable to pay his real estate tax bill. After that conversation, Ms. Werner met Mr. Ibarra, who was looking for a location for his, what he planned to have, cafe. Ms. Werner referred Mr. Ibarra to the owner of the premises where the plaintiffs rented and that the owner complained that he wasn't getting paid. And outside of Ms. Werner's presence and contact, they made a deal that the owner would lease the premises to this new prospective lessee and they agreed. And so that new lessee would take over the premises as of the end of the year, the beginning of 2018. Based on that, those parties applied for the business license, which the village granted them as effective with the beginning of the new year and the beginning of the new lease. So that was the factual background of why the business license for the plaintiff appellants was not renewed. Mr. Ryan, can you, Mr. Schiller makes a fair point that I think warrants a response from you and that is you can't just focus on one little micro piece of this here and there. As he invites, you know, there's a broader mosaic here and that mosaic all surrounds a narrative that, as he urges a jury, should be able to consider. That look, this is a scenario where there was a political payback and no matter what, these gentlemen were going to be run out of town, so to speak. And, you know, it came in, it took a little bit of time and it came in a lot of forms, but lo and behold, it worked. So what's your response to, you know, that narrative, that broader narrative? Well, everything that happened involved either obtaining permits required by the law and the ordinance, violation of, you know, ordinances for parking, the business license renewal, which I just talked about, and during none of those transactions or during the course of time when the permits were being obtained and the tickets were being issued, was there any indication or inference that this was a result of an election in the prior April, April 2017? There's no comments by Ms. Werner or Chief Misetich. We don't even know by the facts who Chief Misetich would have preferred or voted for. There's no evidence that Mary Werner was behind any of the issues. I mean, there were requirements for the permits. They simply weren't meeting the requirements. When they did meet the requirements, the Village Board then granted the permits, first to demolish the building and then eventually to build the parking lot, which then wasn't paid for a long time, during which time they got tickets, during which time the people ticketed originally complained to the Village about them getting tickets because they valeted their car at the restaurant and the valets put the cars in the parking lot illegally, which led to the Chief Misetich issuing his memo that the tickets were to be issued to the restaurant who was valeting the cars in the parking lot. There was nothing outside of the requirements of the permitting process, the parking requirements, or the licensing at the end of the year. They're all, they happened, but they happened for a valid reason. The Village had ordinances that they were enforcing and there was really no connection between the election. And the only connection I see... What's the record, what's the summary judgment record show with respect to Mayor Werner's knowledge that the plaintiffs were supporting the other candidate in the April 17 election? I don't know that there's any evidence in the record that she knew that. I do not recall that being in the District Court's Memorandum of Opinion. So I don't know... Well, all right, but that doesn't... What's in the summary judgment record, not in the opinion? Because didn't they hold some kind of reception or happy hour or something at the restaurant or the lounge? Yes, a fundraiser they held for the opponent of Mary Werner during the election. Right, and what's the written record and the deposition testimony suggest with respect to Mayor Werner's knowledge of that event? I don't recall there being any evidence that she knew or didn't know about it. I really don't know the answer to that question. You know, something I'm just curious about, just because a long time ago with stuff in politics, what was the margin of victory for Werner? I do not know the answer. How close was it? I don't know the answer to that question, Your Honor. You really don't? No. All right, well, I guess I don't need to know. Anything further, Mr. Ryan? I have nothing further, Your Honors. Okay, thank you very much. Mr. Schill, we'll turn back to you. Do you know the answer to that question I was asking? Yeah, I was trying to scan through the deposition for Werner. What I know, I don't know what, I can't, I didn't have enough time to find Werner's deposition. I do know that there was testimony in both of my clients' depositions that they were told she was aware. And so they held a fundraiser, they actively supported with donations, as I'm sure you know, in Illinois, all donations are publicly reported on the website. Especially in small elections like this, people track those donations. I don't know any politician, especially in small elections, when you're talking about donations total of $30,000, $40,000, who aren't aware in their village who made donations to who. So I think that's a reasonable inference. I did not have enough time. I don't recall from Mayor Werner's deposition, I don't have enough time, I didn't have enough time to look to see if the question was asked, if she had knowledge. But I think there was enough evidence in the record just objectively that she would have had knowledge. I can't, again, and then to answer Judge Mannion's question, it was a few hundred votes, but again, this is a small village, so a few hundred votes is actually a fairly high percentage. So however you look at it, the race was either close or not close. Because, and I think the importance of the fact that this is a village just of 10,000 people with a very small governmental staff, with a very small police force, with a police chief that serves multiple purposes, and he is the person at every zoning board dealing with law enforcement questions. Obviously, in the state of Chicago, that's a completely different person. I think those facts, they are just a matter of public record, are important to understand. It was Police Chief Misicek who did testify in his deposition that the ordinance used to ticket FKFJ, again, and all those tickets were dismissed because they were neither the owner nor the car parker, nor at the time were they using the valet for this when all these tickets were issued. Misicek testified that ordinance had never been used against anybody else since or before. So I don't know, that's evidence not only of an equal protection, but to me, that is evidence of retaliation. If you scour your municipal code to find an ordinance that's never been used and decide to use it to ticket somebody three months after they actively and publicly with money supported your opponent in what was, percentage-wise, not that close race, but what was vote-wise, arguably, a close race, that is evidence of animus and it's such a small staff, such a small police department, it's hard, I think it's a reasonable inference that everybody knew everything. Thank you. Okay, Mr. Schiller, thanks to you. Mr. Ryan, thanks to you. Hope you both have a good rest of the day. The court stands adjourned. Thank you. Until tomorrow morning, I believe. Thank you.